USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/25/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-v-

MICHAEL ORTIZ,

Defendant.

25-cr-345 (LJL)

MEMORANDUM AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendant Michael Ortiz, a/k/a "Dot" ("Defendant" or "Ortiz"), is charged in seven counts of a nine-count indictment (the "Indictment"). The first four counts—conspiracy to commit Hobbs Act robbery, substantive Hobbs Act robbery, murder through the use of a firearm, and the use of a firearm during a crime of violence—relate to Ortiz's alleged participation in the September 1, 2020 robbery and murder of Jeffrey German ("German"). Dkt. No. 6 ¶¶ 1–7. Counts Five through Seven—conspiracy to commit Hobbs Act robbery, substantive Hobbs Act robbery, and use of a firearm during a crime of violence—relate to Ortiz's alleged participation in a robbery on November 3, 2020, during which the victim was shot and survived. *Id.* ¶¶ 8–10.[1] Trial of this matter is scheduled to begin on December 7, 2026.

The Government now moves prior to trial and *in limine* for the following relief: (1) an order ruling admissible text messages between one of Ortiz's alleged co-conspirators, Randy Maccow ("Maccow") and German, in which Maccow set up the meeting that led to the September 2020 robbery in which German was killed; (2) an order ruling admissible evidence of

[1] Ortiz is not charged in Counts Eight and Nine of the Indictment, which charge defendant Storm Jones with conspiracy to distribute narcotics and the use, carriage, and possession of a firearm during and in relation and furtherance of the narcotics offense charged in Count Eight. *Id.* ¶¶ 11–14.

a 911 call that Maccow made about one year before the murder, in which Maccow called from the same phone number he used to communicate with German on the night of the murder; (3) an order ruling admissible testimony about a confession made by one of Defendant's co-conspirators in the November 2020 murder, Francis Ofori ("Ofori"), while Ofori was incarcerated, in which Ofori inculpated both himself and Defendant; (4) an order precluding Ortiz from arguing that he acted in self-defense when he shot German; (5) an order admitting evidence of Ortiz's participation in a non-fatal shooting on July 16, 2020 and his participation in a robbery in or around August 2020, as direct evidence of the charged conspiracies, as background evidence, and under Federal Rule of Evidence 404(b); and (6) an order precluding the defense from offering alibi evidence. Dkt. No. 113. The Government also requests that the Court order Defendant to comply with his disclosure obligations pursuant to Federal Rule of Criminal Procedure 16(b). *Id.*

Ortiz moves *in limine* for an order: (1) precluding the Government's Rule 404(b) evidence; and (2) limiting testimony from the Government's ballistics expert. Dkt. No. 110.[2] By a supplemental motion, Ortiz also moves *in limine* for an order: (1) precluding the Government from offering evidence of a threat that he allegedly made to have his brother and his brother's girlfriend killed; and (2) precluding the Government from offering evidence that he confessed his participation in German's murder to a confidential witness. Dkt. No. 121. The defense also moves to dismiss Counts Three, Four, and Seven of the Indictment on the grounds that a completed Hobbs Act robbery is not a crime of violence under 18 U.S.C. § 924(c). Dkt. No. 109.

---

[2] The defense also seeks a right to reply to the Government's opposition to Defendant's motions *in limine*. The Court granted that application by order dated November 16, 2026. Dkt. No. 118.

The purpose of a motion *in limine* is "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines*, 652 F. Supp. 1400, 1401 (D. Md. 1987)). The decision whether to grant an *in limine* motion "resides in a district court's inherent and discretionary 'authority to manage the course of its trials.'" *United States v. Ray*, 2022 WL 558146, at *1 (S.D.N.Y. Feb. 24, 2022) (quoting *Highland Cap. Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008)). "The trial court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006). "Because a ruling on a motion *in limine* is 'subject to change as the case unfolds,' this ruling constitutes a preliminary determination in preparation for trial." *United States v. Perez*, 2011 WL 1431985, at *1 (S.D.N.Y. Apr. 12, 2011) (quoting *Palmieri*, 88 F.3d at 139); *see United States v. Phillips*, 2023 WL 6620146, at *3 (S.D.N.Y. Oct. 10, 2023).

## DISCUSSION

### I. The Text Messages Between Maccow and German

The Government moves for an order ruling admissible evidence of communications exchanged between Ortiz's alleged co-conspirator, Maccow, and Ortiz's alleged victim, German, on August 30 and September 1, 2020. The Government's theory of the case is that Ortiz and his co-conspirators lured German to the scene of the robbery, 1908 Prospect Avenue in the Bronx, on the premise that they would purchase marijuana from him, and that when German arrived at the scene, Ortiz and his co-conspirators (including Maccow) robbed him, and Ortiz shot and killed him. The communications reflect Maccow and German discussing the proposed sale of marijuana and meeting at 1908 Prospect Avenue. They reflect a brief call from the telephone

number 718-924-0915 (the "0915 Number"), which the Government proffers it will establish was from Maccow to German at 11:53 p.m. on August 30, 2020, approximately 24 hours before the murder, followed by a text message exchange one minute later between German and Maccow, in which German lists various types of marijuana and the prices for each and Maccow responds, "Say that." It also includes an exchange beginning at 12:14 a.m. on September 1, 2020 during which the two discuss the anticipated marijuana sale and a meeting at 1908 Prospect Avenue. The motion is granted.

The Government argues that Maccow's messages are statements in furtherance of the conspiracy admissible under Federal Rule of Evidence 801(d)(2)(E) and that, to the extent that German's responses contain assertive content, they are admissible under Federal Rule of Evidence 803(3) as a statement of his then-existing state of mind, including his motive, intent, or plan. Dkt. No. 113 at 5–11. The defense does not dispute that Maccow's statements on September 1, 2020 were in furtherance of a robbery conspiracy and that German's statement that he would "[b]e there in a few minutes" was an admissible statement of his intent. Dkt. No. 125 at 2. Ortiz argues, however, that Maccow's statements made two days before the charged conspiracy could not have been made in furtherance of it, and that German's response asking Maccow what he needed and proposing a price are not statements of intent with respect to the future but simple business negotiations. *Id.*

Rule 801(d)(2)(E) provides that out-of-court declarations are not excludable as hearsay if they are made "by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). "To admit an out-of-court declaration under this rule, the district court must find by a preponderance of the evidence '(a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that

the statement was made during the course of and in furtherance of the conspiracy.'" *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (quoting *United States v. Al–Moayad*, 545 F.3d 139, 173 (2d Cir. 2008) (internal quotation marks omitted)).

The messages exchanged between Maccow and German on August 30, 2020, two nights before the armed robbery and murder, are admissible. German sent a list of marijuana prices and Maccow responded: "Say that." German's statements are admissible as evidence of his state of mind—that he was willing to sell marijuana to Maccow at the prices specified.[3] Fed. R. Evid. 803(3). It is irrelevant that German did not state explicitly that he intended to sell the marijuana to Maccow. A statement need not be in the form of "I intend" to reflect the declarant's then-existing state of mind. *See, e.g.*, *United States v. DeJesus*, 806 F.2d 31, 33, 35 (2d Cir. 1986) (holding that an intercepted, partly coded call in which two conspirators negotiated a heroin sale, discussing the drugs' quality and delivery, was admissible under Rule 803(3) to prove that both "intended to carry out a narcotics transaction," although neither explicitly stated that intent); *United States v. DiMaria*, 727 F.2d 265, 270–71 (2d Cir. 1984) (Friendly, J.) (holding admissible under Rule 803(3) a defendant's statement that he "only came here to get some cigarettes real cheap," from which the jury could infer that his "existing state of mind was to possess bootleg cigarettes, not stolen cigarettes," because "[i]t would defy reality to predicate any contrary conclusion on the use of the words 'I came' rather than 'I am'"). Maccow's response is not hearsay. It is admissible to show that Maccow received notice of German's intent to sell marijuana and, to the extent it expresses interest in that sale, it also reflects his state of mind.[4]

---

[3] German's responses to Maccow also supply the necessary context to make Maccow's statements intelligible. *See United States v. Sorrentino*, 72 F.3d 294, 298 (2d Cir. 1995) (holding that an informant's recorded statements to the defendant were not hearsay because they were offered "only to render what [the defendant] said in these conversations intelligible").

[4] In addition, it is well established that "[t]he admissibility of the statement under Rule

German's statements on the night of the armed robbery and murder also are admissible as evidence of his state of mind and plan to travel to 1908 Prospect Avenue. Fed. R. Evid. 803(3). That German stated that he was on his way is probative of his intent to travel to 1908 Prospect Avenue and is admissible to show that he travelled to that location for the marijuana transaction. *See Mut. Life Ins. Co. of N.Y. v. Hillmon*, 145 U.S. 285, 295–96 (1892) (declarant's letters stating his intention to travel with Hillmon were admissible as evidence of that intention and tended to show that he carried it out).

## II. Maccow's Prior 911 Call

The Government moves for an order permitting it to offer evidence that approximately one year before German's murder, Maccow identified the 0915 Number as belonging to himself. The evidence comes in the form of a recorded call to 911 on September 25, 2019, during which the caller identified himself as Maccow, provided his phone number as the 0195 Number, and asked for the assistance of an ambulance for his pregnant girlfriend who needed medical attention. The Government argues that the call—including the caller's identification of himself as Maccow and of the 0915 Number as his number—is admissible as a present sense impression under Federal Rule of Evidence 803(1) or pursuant to the residual exception to the hearsay rule, Federal Rule of Evidence 807. Dkt. No. 113 at 11–17. Ortiz responds that the statements of the caller to 911 regarding the caller's name and telephone number are not admissible under Rule 803(1) because they describe neither an event nor condition. Dkt. No. 125 at 2–3. He further

---

801(d)(2)(E) turns upon the understanding between the declarant and the defendant at the time it was made as well as the purpose for which it was made; it does not rest upon the outcome of the prosecutor's later decision whether to charge the conspiracy in the indictment. Thus, the conspiracy in furtherance of which the statement was made does not have to be the conspiracy charged in the indictment." *United States v. Ray*, 2022 WL 842254, at *1 (S.D.N.Y. Mar. 20, 2022) (citing *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999)). The Government thus is not bound to the allegations of the Indictment in showing that Maccow's statements were made in furtherance of a conspiracy in which Ortiz was or became a participant.

argues that the statement does not satisfy the residual hearsay exception because "[p]eople lie when they call 911, including about who they are," and because by the time the 911 operator asked for the caller's name and phone number, the caller had already requested an ambulance and the operator was in the process of contacting EMS. *Id.* at 3.

Under Federal Rule of Evidence 803(1), "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is admissible even where the declarant is available as a witness. Fed. R. Evid. 803(1). "To qualify as a present sense impression, (1) the statement must describe the event perceived; (2) the declarant must have in fact perceived the event described; and (3) the description must be substantially contemporaneous with the event in question." *United States v. Ramos*, 2023 WL 9002868, at *1 (S.D.N.Y. Dec. 28, 2023) (citing *United States v. Smothers*, 652 F. Supp. 3d 271, 293 (E.D.N.Y. 2023)). The statement must describe the events as the declarant is perceiving them firsthand and in real time. *See, e.g.*, *Carr v. Fischer*, 283 F. Supp. 2d 816, 837 (E.D.N.Y. 2003); *United States v. Urena*, 989 F. Supp. 2d 253, 260 (S.D.N.Y. 2013).

Under the residual hearsay exception, a statement is not excluded by the rule against hearsay if:

> (1) the statement is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a). "To be admissible under this exception, 'the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice and notice.'" *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991) (citations omitted)); *see also United States v. Dawkins*, 999 F.3d 767, 791 (2d Cir. 2021); *Silverstein v. Chase*, 260 F.3d 142, 149 (2d Cir.

2001). Rule 807 is a catch-all to be invoked "'very rarely, and only in exceptional circumstances.'" *United States v. Ulbricht*, 858 F.3d 71, 123 (2d Cir. 2017) (quoting *Parsons*, 929 F.2d at 907).

Most of the call is admissible as a present sense impression, and any portion that is not satisfies the residual exception. Maccow's identification of himself as the caller is a present sense impression. It describes an event that Maccow was perceiving—his own call to the 911 dispatcher—and the identification was made while that event was underway. Fed. R. Evid. 803(1). The distinctive feature of this particular 911 call is that the declarant relaying the impression of the event perceived is conveying an impression about himself. The caller is identifying himself by name as the caller. But that is not disqualifying. Suppose a third person had been on a conference call with 911 and, being in Maccow's presence, could observe that Maccow was the one speaking to the dispatcher. The Court would admit that person's statement that Maccow was calling 911 as a present sense impression. The third person's statement would convey the impression that a person he knew to be Maccow was calling 911. The identification of Maccow would not be from "memory," since the third person already knew who Maccow was. It would be of an "unfolding event"—the event of Maccow calling 911. Dkt. No. 125 at 3. The result should be no different when it is not a third person who is identifying Maccow as making the call but Maccow who is identifying himself. The admission of a statement as a present sense impression, after all, does not turn upon an assessment of the declarant's credibility, but on the view that "[s]uch statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory." *United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). There is no

apparent reason why the declarant's statement of his own name would be less trustworthy than the declarant's statement of the name of another.[5]

The Court's conclusion is consistent with *United States v. Lovato*, 950 F.3d 1337 (10th Cir. 2020). There, the caller gave the 911 operator his name, phone number, and address when relaying that he had witnessed a shooting. *See id.* at 1339–40, 1343. Noting that "[t]he caller was not anonymous, but rather provided his full name, phone number, and home address during the call," the Tenth Circuit explained that "[t]hese factors equally support the truthfulness of each statement within the 911 call, which were all admissible as present sense impressions." *Id.* at 1343. To be sure, the defendant in *Lovato* challenged the call as a whole, and the court considered "the admissibility of the 911 call as a whole, rather than parsing each individual statement within the call." *Id.* at 1342–43. The court thus reached its conclusion without separately analyzing the caller's statement of his own name.

In any event, the call is admissible under the residual exception to the hearsay rule. The trustworthiness of the statement—that the caller's name was Maccow and that the 0915 Number was his phone number—is corroborated by the circumstances under which the call was made. *See United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999) ("To evaluate whether a statement is sufficiently trustworthy, we look to evidence that corroborates both the declarant's trustworthiness and the truth of the statement."). There is no dispute as to the authenticity of the recording. Dkt. No. 113 at 11 n.2. The veracity of the statements is supported by the fact that Maccow was reporting facts about himself and of which he would have personal knowledge. *See*

[5] The Court need not reach the question whether the caller's statement regarding the number of the phone is a present sense impression. It could be argued that the number was not something that the caller observed but something that he knew from memory. Even if the number is not a present sense impression, the call is admissible under the residual hearsay exception.

*United States v. Moore*, 824 F.3d 620, 623 (7th Cir. 2016). He would have "had no obvious reason to lie." *Id.* The call was made a year before the events in question in this case, and Maccow would have "had no reason to believe that his phone number would be integral in the criminal prosecution of another man." *Id.* To the contrary, under the circumstances, Maccow would have had every reason to be truthful. As the contents of the call reflect, Maccow was calling to request an ambulance to assist his pregnant girlfriend who was having difficulty walking and who was "really in pain," and he made the statements in question while the dispatcher was waiting for the ambulance operator to answer. Dkt. No. 113 at 12–13. The caller would have needed to provide accurate information if—as the circumstances of the call indicate might be a possibility—either the call were to be disconnected before EMS picked up, or if EMS wanted to be in touch with the caller. The truthfulness of the caller's statement identifying himself as Maccow and providing his phone number is further corroborated by evidence that the call was in fact made from the 0915 Number, and from the fact that when the dispatcher later said "Randy?", the caller responded "yea?". *Id.* at 13.

While Ortiz argues that "[p]eople lie when they call 911, including about who they are," Dkt. No. 125 at 3, he offers no evidence or argument why a person calling 911 to request an ambulance for a loved one would lie when asked for his name and call-back number. In the analogous circumstance, when courts have asked whether a call to 911 is sufficiently reliable to be admissible as a present sense impression, they have had no difficulty answering in the affirmative. *See, e.g.*, *United States v. Mejia–Velez*, 855 F. Supp. 607, 613–14 (E.D.N.Y. 1994) (tapes of two 911 calls, one 2–3 minutes after shooting, the other approximately 16 minutes after shooting, were sufficiently contemporaneous with event and therefore admissible as present sense impressions); *United States v. Shoup*, 476 F.3d 38, 42 (1st Cir. 2007) (a 911 phone call

made only one or two minutes immediately following event was admissible); *United States v. Campbell*, 782 F. Supp. 1258, 1260–61 (N.D. Ill. 1991) (statements on 911 tape were admissible as present sense impression where call was made almost immediately after defendant left store after shooting incident). There is no reason why this call, even if parts of it might not strictly qualify as a present sense impression, would be any more unreliable.

Evidence beyond the call further corroborates that Maccow was the caller. When Ortiz's brother, Raiyman Mohan, was arrested for a domestic assault on May 25, 2019—four months before the 911 call—NYPD records reflect that, while in custody, Mohan attempted to call "Randy," who was listed as a "friend/acquaintance" at the 0915 Number. The Government proffers that video and other evidence will also show that Mohan was present at Ortiz's residence with Maccow, Ortiz, and the other perpetrators before and after the September 1, 2020 armed robbery. A witness will testify that Maccow was using the 0915 Number that evening. 911 records reflect that the caller to 911 was calling from the 0915 Number. Additionally, when Maccow was arrested in March 2022, detectives played the 911 call for him and he acknowledged that the voice on the call appeared to be his. Dkt. No. 113 at 16.

The connection between Maccow and the 0915 Number is material. It links Maccow, and therefore Ortiz, to the text messages luring German to the scene of the robbery. The Government also has proffered—and Ortiz does not dispute—that it is more probative on the point for which it is offered than any other evidence the Government can obtain through reasonable efforts. Maccow has pleaded guilty in connection with this case, and his lawyer confirms that he would invoke his Fifth Amendment privilege against self-incrimination and refuse to testify if he were called as a witness. Dkt. No. 113 at 16 n.4. Law enforcement agents were not able to recover the phone associated with the 0915 Number from Maccow or from

anyone else, and a subpoena did not identify any subscriber information, which the Government represents is often the case for pre-paid phones. *Id.* at 16. Agents also have not been able to identify any other instances in which Maccow—or anyone else around the time of the robbery and murder—identified the 0915 Number as his or her own. *Id.*[6]

## III. Ofori's Confession to the November 3, 2020 Robbery

Counts Five through Seven of the Indictment charge Ortiz for his participation in the November 3, 2020 armed robbery of a marijuana dealer. Dkt. No. 6 ¶¶ 8–10. The Government's theory is that Ortiz and four other individuals participated in the robbery on Fairmount Place in the Bronx on the late night of November 2, 2020 and the early morning of November 3, 2020, after one of the participants identified the target and set up the purported purchase. Dkt. No. 113 at 4. One of those participants was Ofori. According to the Government's theory, the group of five approached the victim on both sides of the car in which the victim was waiting and pointed guns at him, while one of the conspirators entered the victim's car. The victim ultimately escaped and called 911, but not before he was shot through the hand and the co-conspirator who was in the back seat of the victim's car was knocked out of the car and into the street. *Id.*

The Government proffers that a confidential witness ("CW-1") will testify that while he was detained at the Metropolitan Detention Center ("MDC") with Ofori, Ofori confessed that (i) he, Ortiz, and at least two other individuals participated in the robbery of an individual who wore flashy jewelry and who had marijuana; (ii) while committing the robbery, a gun went off, striking the victim; and (iii) during the robbery, one of the perpetrators who was in the back seat of the victim's car was injured and arrested. Dkt. No. 113 at 17–18. The Government's theory is that Ofori was describing the November 3, 2020 robbery. Ofori has since pleaded guilty to a

---

[6] There is no dispute that the notice requirement under Rule 807(b) has been satisfied. *See* Dkt. No. 113 at 14 n.3.

crime related to the November 3, 2020 robbery and, if subpoenaed for trial, would invoke his Fifth Amendment right against self-incrimination. *Id.* at 17. The Government offers the confession as a statement against interest under Federal Rule of Evidence 804(b)(3).

"Federal Rule of Evidence 804(b)(3) permits the admission of a statement against an unavailable declarant's penal interest if the statement, when made, had so great a tendency to expose the declarant to criminal liability that a reasonable person in his position would have made the statement only if he believed it to be true, and corroborating evidence clearly indicates the trustworthiness of the statement." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017). "Rule 804(b)(3) is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994). "A statement may be admitted under Rule 804(b)(3)'s hearsay exception for statements against penal interest only if the district court determines that a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest." *United States v. Saget*, 377 F.3d 223, 231 (2d Cir.) (Sotomayor, J.), *supplemented*, 108 F. App'x 667 (2d Cir. 2004). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context." *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007); *accord Williamson*, 512 U.S. at 603 ("whether a statement is self-inculpatory or not can only be determined by viewing it in context"). "'A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant.'" *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (quoting *United States v. Garris*, 616 F.2d 626, 630 (2d Cir.), *cert. denied*, 447 U.S. 926 (1980)).[7]

[7] Ortiz does not mount a Confrontation Clause challenge. "[A] declarant's statements to a

Ofori's admissions constitute a statement against penal interest. Ofori has indicated that he will invoke his Fifth Amendment privilege against self-incrimination if called as a witness at trial and thus he is indisputably unavailable. *See United States v. Jackson*, 335 F.3d 170, 177 (2d Cir. 2003) (witnesses who invoke their Fifth Amendment privilege against self-incrimination are "unavailable" within the meaning of Rule 804(b)). At the time Ofori made the statement, he was detained at the MDC facing charges related to the November 3, 2020 robbery, including that he violated and conspired to violate the Hobbs Act. Dkt. No. 6 ¶¶ 8–10. His statement to CW-1 inculpated himself in that crime and tended to subject him to criminal liability. He described his involvement and that of others in a robbery that corresponded in time, method of operation, and activity with the crime with which he was charged in the Indictment. The statement also was made to a person whom he did not know to be cooperating with law enforcement and whom he would have viewed as an ally and did not reflect an attempt "to shift blame or curry favor." *Williamson*, 512 U.S. at 603. To be sure, a declarant's "non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" does not fall within the exception for statements against penal interest. *Id.* at 600–01. But Ofori's statements do not fall within that category. His statements "were self-inculpatory because they described acts that [he and Defendant] committed jointly." *Saget*, 377 F.3d at 231. By stating that he did not commit the crime alone but with others, including with Defendant, Ofori admitted that he engaged in conduct that would constitute a conspiracy. His statements thus are self-inculpatory and admissible against Defendant. *See Dupree*, 870 F.3d at 80 (holding admissible the statement that the declarant and his brothers broke into the victim's car, stole his drugs and money, and beat

---

confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*." *Saget*, 377 F.3d at 229; *accord United States v. Farhane*, 634 F.3d 127, 163 (2d Cir. 2011).

him up as a statement against penal interest); *Williams*, 506 F.3d at 155 (statement that inculpated defendant was admissible as a statement against penal interest because it described "acts that the defendant and the confessor committed jointly" and did not reflect an attempt to shift blame or to curry favor).

Ortiz's only response is to challenge the credibility of CW-1. Dkt. No. 125 at 4. The Government does not dispute that when CW-1 was first interviewed by the Government, he relayed that the statements about the November 3, 2020 robbery were made by Defendant. A year later, when he was again interviewed by the Government, he ascribed the statements to Ofori. The discrepancies in CW-1's account, however, are not a basis for excluding his testimony. While Ortiz is correct that there must be "corroborating circumstances" of trustworthiness, there are corroborating circumstances of Ofori's account, *see* Dkt. No. 130 at 4 (describing video of the November robbery), and in any event Rule 804(b)(3) requires that the corroborating circumstances indicate the "*declarant's* trustworthiness." *Dupree*, 870 F.3d at 80 (emphasis added); *see United States v. Katsougrakis*, 715 F.2d 769, 775 (2d Cir. 1983) (stating that "circumstances surrounding the conversation confirmed the reliability of the hearsay declaration and [the declarant's] belief in its truth"). The declarant here is Ofori. CW-1 will be a witness at trial, and the defense can cross-examine him about who made the statement to him and thus attempt to call into question CW-1's credibility. But the Government has established the existence of corroborating circumstances indicating the trustworthiness of the statement made to him. *See* Dkt. No. 130 at 4.[8]

[8] In its letter opposing Ortiz's supplemental motions *in limine*, the Government advises the Court of new information about its pending motion *in limine* to admit, as a statement against penal interest, CW-1's testimony that co-conspirator Ofori admitted to participating in the charged in Counts Five through Seven. Dkt. No. 132 at 4–5. According to the Government, CW-1 now recalls two separate conversations. In the first, Ortiz told CW-1 that he, CW-2, and others had

## IV. The Government's Motion to Preclude Any Argument that Ortiz Acted in Self-Defense

The Government moves to preclude evidence or argument that Ortiz acted in self-defense in connection with the September 1, 2020 murder of German. Dkt. No. 113 at 22–23. It argues that self-defense is not an available defense to a defendant who has initiated a violent crime, such as an armed robbery that has resulted in a fatal shooting. *Id.*

"[A] defendant who initiates a violent crime, such as an armed robbery, that results in a fatal shooting may not claim self-defense absent a showing that, at the time the shooting occurred, the dangerous situated created by the initial crime had dissipated." *United States v. Desinor*, 525 F.3d 193, 199 (2d Cir. 2008). Ortiz has not submitted a request for a charge on self-defense, *see* Dkt. No. 111, and has not responded to the Government's argument. It is apparently undisputed that German was unarmed at the time of his death. Accordingly, the Government's motion is granted.

## V. Evidence of Prior Criminal Acts

The Government intends to offer testimony from at least two confidential witnesses at trial. CW-1 is an individual who participated in the September 1, 2020 robbery and murder of German. Dkt. No. 113 at 3. The Government asks to permit CW-1 to testify that in August 2020, one month before German's murder, he and Ortiz left Ortiz's residence and drove to a nearby location where they robbed two men who were playing dice of several hundred dollars in

---

recently robbed a marijuana dealer at the location of the German robbery and murder, and that the robbery went awry and resulted in an arrest. In the second, which took place at the MDC after both men were charged federally, Ofori described committing a robbery with the defendant, CW-2, and at least one other individual, and stated that one participant was struck by a car door, knocked unconscious, and arrested, consistent with the evidence concerning the November robbery charged in the Indictment. The Government contends that Ortiz's statements are admissible as statements of a party opponent under Rule 801(d)(2)(A), but it has no motion *in limine* concerning those statements. Accordingly, the Court does not address the admissibility of Ortiz's statements to CW-2 about the robbery.

cash, and during that incident Ortiz pistol-whipped one of the victims. *Id.* at 26. After the robbery, the two fled to Ortiz's residence. *Id.*

CW-2 was a member of a street gang known as the 800 YGz or the "800s," a neighborhood gang that operated in a location approximately four city blocks from Ortiz's residence. *Id.* at 24. CW-2 and CW-1 sold drugs together in a location blocks away from Ortiz's residence. *Id.* at 25. CW-2 will testify that he met Ortiz in or around 2018 after another member of the 800s vouched for Ortiz, including that Ortiz's cousin was a member of the 800s. *Id.* He also will testify that he frequently visited Ortiz and used Ortiz's residence to hide from the police and to store guns and to discuss crimes. *Id.* at 25. The Government asks to permit CW-2 to testify that on or about July 16, 2020, a month and a half before the murder of German, he and Ortiz committed the non-fatal shooting of a rival gang member and then fled to Ortiz's residence. *Id.* at 25–26.

The Government argues that evidence of the two incidents is direct proof of the charged crimes and otherwise is admissible as background evidence and under Federal Rule of Evidence 404(b). *Id.* at 26–31. The defense moves *in limine* to exclude the evidence as propensity evidence and as more prejudicial than probative. Dkt. No. 110 at 2–7.

Federal Rule of Evidence 404(b) provides that evidence of "any other crime, wrong or act" may not be received "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). "The Second Circuit has articulated two exceptions, under which admission of evidence of uncharged criminal activity is not considered other-crimes evidence subject to Rule 404(b)'s limits: (1) if a defendant is

indicted on a conspiracy charge, '[a]n act that is alleged to have been done in furtherance of the alleged conspiracy' is considered 'part of the very act charged' rather than other-act evidence, such that 'uncharged acts may be admissible as direct evidence of the conspiracy itself,' or (2) if the uncharged criminal activity 'arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *Ramos*, 2023 WL 9002868, at *3 (first quoting *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999); and then quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)); *see also* 2 Weinstein's Federal Evidence § 404.20[2][b] (2d ed. 2019) ("An act is intrinsic to a charged offense if the act is inextricably intertwined with the charged offense, when both acts are part of a single criminal episode, or when the other acts were necessary preliminaries to the crime charged."). Prior act evidence is admissible pursuant to Federal Rule of Evidence 404(b) under the Second Circuit's "inclusionary approach" if it is "offered 'for any purpose other than to show a defendant's criminal propensity.'" *Dupree*, 870 F.3d at 76 (quoting *United States v. Mejia*, 545 F.3d 179, 206 (2d Cir. 2008)). The evidence also must satisfy Federal Rule of Evidence 403's balancing test. "[W]hile not all evidence of other crimes is proscribed, it must be examined carefully to ensure that its relevance to an issue in the case will not be outweighed by a jury's tendency to convict a defendant on the basis of his prior crimes." *United States v. Siegel*, 717 F.2d 9, 16 (2d Cir. 1983). Under Rule 403, "[t]he probative value of prior bad-act evidence is not substantially outweighed by the risk of prejudice if the conduct is not 'any more sensational or disturbing' than the charged crime." *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020) (quoting *United States v. Lyle*, 919 F.3d 716, 737 (2d Cir. 2019)).

The Government argues first that the testimony regarding the July 2020 and August 2020 crimes is admissible, without regard to Federal Rule of Evidence 404(b), because it is "inextricably intertwined" with the evidence regarding the charged offenses and arose out of the same transaction or series of transactions as the charged offense. Dkt. No. 113 at 29. It relies on the fact that Ortiz's residence served as a base of operations where he and the respective cooperating witnesses gathered before and after both the uncharged incidents and the charged robberies; that each cooperating witness who participated in an uncharged incident also participated in a charged robbery; and that all of the incidents occurred within several months of each other and involved the use of violence. *Id.* Courts in this District have interpreted the category of other acts that are inextricably intertwined or part of the same series of transactions as the charged offense narrowly. *See Phillips*, 2023 WL 6620146, at *8; *United States v. Johnson*, 469 F. Supp. 3d 193, 204 (S.D.N.Y. 2019). "[T]o avoid Rule 404(b) analysis, evidence of uncharged criminal activity must do more than provide context or be relevant." *United States v. Kassir*, 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009). "'In deciding whether uncharged conduct is 'inextricably intertwined' with charged conduct, courts have considered whether the details of the uncharged transaction are necessary to understand the charged transaction.'" *United States v. Franzone*, 2025 WL 1094496, at *8 (S.D.N.Y. Apr. 11, 2025) (quoting *Johnson*, 469 F. Supp. 3d at 204). "'[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b).'" *Id.* (quoting *Kassir*, 2009 WL 976821, at *2); *accord United States v. James*, 607 F. Supp. 3d 246, 253–54 (E.D.N.Y. 2022).

The Government has not established that evidence of either the July 2020 or the August 2020 incidents is inextricably intertwined with the charged conduct or part of a series of

transactions that included the charged conduct such that it can be admitted without regard to Rule 404(b). As charged, the September 1, 2020 Hobbs Act robbery and conspiracy and the November 3, 2020 Hobbs Act robbery and conspiracy are "discrete offense[s]." *Kassir*, 2009 WL 976821, at *3. The Hobbs Act robbery of German occurred "[o]n or about September 1, 2020." Dkt. No. 6 ¶¶ 4–7. The Hobbs Act robbery of the unnamed victim occurred "[o]n or about November 3, 2020." *Id.* ¶¶ 8–10. Each conspiracy count is likewise tied to a single date and defined by a single object: to rob a marijuana dealer at gunpoint. *See id.* ¶¶ 4–5, 8–9. Neither the July 2020 shooting of a rival gang member nor the August 2020 robbery of two men playing dice falls within that object or time frame. The uncharged conduct thus differs from conduct found to arise out of the same series of transactions as a conspiracy charged over an extended period. *See United States v. Needham*, 377 F. App'x 84, 86 (2d Cir. 2010) (summary order) (uncharged robbery committed two days after the end of a robbery conspiracy alleged to run "[f]rom in or about December 2001, through in or about December 2003," by four of the same participants, "plausibly arose out of the same series of transactions as the alleged conspiracy"); *Johnson*, 469 F. Supp. 3d at 208 (uncharged robbery committed within the charged period was direct evidence of a racketeering conspiracy whose alleged purposes included enriching members through robberies). The Government explains that the robbery of German occurred after the group on the night of the murder agreed to rob him, Dkt. No. 113 at 2, and that the November robbery occurred overnight between November 2 and November 3, 2020, after one of the participants identified the target and set up the purported purchase, *id.* at 4. There is no claim that the July 2020 and August 2020 conduct was undertaken "to conceal or further the charged conduct," and it "is not essential to understanding the sequence of events surrounding the charged conduct." *Kassir*, 2009 WL 976821, at *3. The "'details of the uncharged [conduct]

are [not] necessary to understand the charged [conduct].'" *United States v. Martoma*, 2014 WL 31191, at *3 (S.D.N.Y. Jan. 6, 2014) (quoting *United States v. Stein*, 521 F. Supp. 2d 266, 271 (S.D.N.Y. 2007)).

That Ortiz and the cooperating witnesses gathered at Ortiz's residence before and after both the charged robberies and the uncharged incidents does not alter this conclusion. The use of the residence in connection with the charged robberies can be proved, and understood, without reference to the July and August 2020 incidents. Nor does the fact that each cooperating witness participated in both an uncharged incident and a charged robbery make those incidents part of the charged offenses. *See United States v. Nektalov*, 325 F. Supp. 2d 367, 370–72 (S.D.N.Y. 2004) (prior transactions between the defendant and the same cooperating witness, though similar to the charged conduct, were "a series of distinct cash for gold transactions" admissible only under Rule 404(b)); *Johnson*, 469 F. Supp. 3d at 206 (shooting was not direct evidence of the charged racketeering enterprise notwithstanding the Government's contention that gang members frequently "hung-out" at the store where it occurred and that the defendant sometimes stored firearms there).

The Government also argues that the evidence is admissible generally and under Rule 404(b) for a proper purpose in that it provides background to the crimes charged in the Indictment and the development of the relationship of trust between Ortiz on the one hand and CW-1 and CW-2 on the other. Dkt. No. 113 at 29. It further argues that the evidence is admissible under Rule 404(b) because it "bears directly on Ortiz's knowledge and intent to engage in robberies and shooting in this case." *Id.* at 30.

The evidence of the August 2020 armed robbery is admissible both as evidence of Defendant's knowledge and intent with respect to the September 2020 robbery and "to help

explain how the illegal relationship between participants in the crime developed, [and] to explain the mutual trust that existed between coconspirators." *Diaz*, 176 F.3d at 79 (quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993)). Evidence of a prior act is admissible to show knowledge or intent. "Rule 404(b) does not authorize the admission of any and every sort of other-act evidence simply because a defendant proffers an innocent explanation for the charged conduct." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993). The evidence must be probative of knowledge or intent, and "[p]robative value is dependent on the existence of a 'close parallel' between the crime charged and the acts shown." *United States v. Corey*, 566 F.2d 429, 431 (2d Cir. 1977) (quoting *United States v. Chestnut*, 533 F.2d 40, 49 (2d Cir.), *cert. denied*, 429 U.S. 829 (1976)). "When the other act is unconnected with the offense charged it must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw from that act the knowledge [or intent] inference advocated by the proponent of the evidence." *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987).

The Second Circuit has repeatedly held that "evidence of prior acts [is admissible] to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Rosa*, 11 F.3d at 334. The "requirement that the past act and charged conduct be similar applies only in cases in which the other act evidence is offered to prove the defendant's intent or knowledge." *United States v. Araujo*, 79 F.3d 7, 8 (2d Cir. 1996). The Government need not prove similarity between the prior act and the charged conduct where the prior act is being offered "to show the background of a conspiracy or a relationship of trust." *Id.*[9]

[9] Although there is some ambiguity in the case law, the Second Circuit has treated the use of

At trial, the Government will have to prove that Ortiz intended to rob German and acted with knowledge that German would be robbed when he met German on the night of September 1, 2020. Dkt. No. 114 at 12–13 (Government's requests to charge); *see Rosemond v. United States*, 572 U.S. 65, 76–77 (2014) (aider and abettor's intent "must go to the specific and entire crime charged," and is shown where he "actively participates in a criminal scheme knowing its extent and character"). It is not enough, as the defense suggests, for the Government to prove that Ortiz's presence was not a "mistake" or an "accident," or that he knew that a gunshot could result in death or serious injury. Dkt. No. 127 at 4. Ortiz thus has not removed the element of knowledge or intent from the case. *See United States v. Colon*, 880 F.2d 650, 657 (2d Cir. 1989) (intent remains in issue unless the defendant disclaims it "with sufficient clarity" that the court could instruct the jury it is undisputed); *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) ("Where, for example, the defendant does not deny that he was present during a narcotics transaction but simply denies wrongdoing, evidence of other arguably similar narcotics involvement may, in appropriate circumstances, be admitted to show knowledge or intent."). And evidence that Defendant and CW-1 set out together from Ortiz's residence to rob the dice players in a location near the residence, and that they did so while in possession of a firearm before returning to Ortiz's residence, is probative of the proposition that when Ortiz set out with CW-1 from Ortiz's residence just one month later with a firearm and met German nearby the residence, Ortiz and CW-1 did so with the intent—not simply to purchase marijuana from German—but to rob him at gunpoint. Both crimes originated from Ortiz's residence, terminated at his residence, involved the possession of a firearm, and involved the use of that firearm in

evidence to explain the background of a conspiracy or the basis for a relationship of mutual trust as a permissible purpose under Rule 404(b). *See Rosa*, 11 F.3d at 334.

connection with the robbery. There are differences between the acts; in the September 2020 robbery, the victim was lured to the scene of the crime with the promise that the co-conspirators would purchase marijuana, the robbery took place late at night, and the firearm was discharged rather than used to pistol-whip the victims. But for the evidence to be probative there need only be "'*substantial* relevancy,'" not "'synonymity.'" *Gordon*, 987 F.2d at 908 (quoting *United States v. Afjehei,* 869 F.2d 670, 674 (2d Cir. 1989)).

The evidence from CW-1 is also probative to show the relationship of trust between CW-1 and Defendant. The Court understands that CW-1 is expected to testify that he and Defendant set out together and with others to rob German at gunpoint. The jury thus will be asked to judge CW-1's credibility and whether, if Defendant intended to rob German at gunpoint, he would have involved CW-1 in that crime and made CW-1 a witness to his conduct. The defense argues that the Government can show a relationship of trust between the two by eliciting evidence that CW-1 "spent considerable time with [Ortiz], and even lived with him for a period, at his house on Elsmere Place." Dkt. No. 127 at 3. But such anodyne testimony would not come close to establishing that Ortiz would feel comfortable robbing a drug dealer at gunpoint in the presence of CW-1, with the potential criminal consequences of such conduct for both CW-1 and Ortiz. The fact that the two had committed an armed robbery crime together in the recent past would have the tendency to make it more likely that Defendant would have trusted CW-1 if Defendant set out to commit an armed robbery in September 2020 and thus would tend to make it more likely that Defendant and CW-1 were co-conspirators in the armed robbery of German in September 2020.

Finally, the conduct in connection with the August 2020 robbery is not "any more sensational or disturbing" than the charged crime, *Lyle*, 919 F.3d at 737, and is not "so

inflammatory in comparison to the other evidence" expected to be presented a trial such that there is a risk that Ortiz might be convicted based on his involvement with the August 2020 robbery and not on the evidence presented with respect to the September 2020 robbery, *Siegel*, 717 F.2d at 17.[10]

The Court will hear oral argument with respect to the admissibility of the July 2020 conduct as Rule 404(b) evidence at the final pretrial conference scheduled for December 1, 2026 at 2:00 p.m.

## VI. The Government's Motion to Preclude Alibi Evidence

The Government served defense counsel with a written request for notice of any intended alibi defense as to any charge in the Indictment. Dkt. No. 113. Ortiz has not responded to the notice. The Government thus moves to preclude the defense from offering evidence of an alibi.

Federal Rule of Criminal Procedure 12.1 permits the government to request in writing that the defendant notify it of any intended alibi defense and requires the defense "[w]ithin 14 days after the request, or at some other time the court sets," to service written notice of the intended alibi defense with the specific places the defendant claims to have been at the time of the alleged offense and the names, addresses, and telephone numbers of each alibi witness upon whom the defense intends to rely. Fed. R. Crim. P. 12.1(a). "Rule 12.1 is 'for the primary benefit of the [G]overnment,' and 'should it so desire, [the Government] has the ability to obtain

---

[10] In reply, Ortiz argues that the 3500 material shows that the decision to prohibit CW-1 from carrying a gun to the German robbery was made by Ortiz's brother, not Ortiz, after CW-1 broke a gun during the August 2020 robbery. Dkt. No. 127 at 3. Ortiz argues that the decision therefore does not provide necessary context for the charged conspiracy, and in any event, CW-1 can explain why he was unarmed without describing the August 2020 robbery. *Id.* For its part, the Government argues that it will show that Ortiz's brother and Ortiz himself were present for the discussion where it was decided that CW-1 would not be permitted to carry a gun. *See* Dkt. No. 113 at 16; Dkt. No. 126 at 6. Because the August 2020 armed robbery is admissible, however, the Court will also permit CW-1 to testify that he did not carry a firearm to the September 2020 armed robbery because it broke during the August 2020 armed robbery.

advance notice of an alibi defense in order to avoid unfair surprise and delays at trial.'" *United States v. Alexander*, 2026 WL 182364, at *2 (S.D.N.Y. Jan. 22, 2026) (quoting *United States v. Bouye*, 688 F.2d 471, 475 (7th Cir. 1982)). "The Advisory Committee Notes to Rule 12.1 state that the rule's objective is to 'provid[e] a mechanism which will enable the parties to have specific information in advance of trial to prepare to meet the issue of alibi during the trial,' and to avoid 'unnecessary interruption and delay in the trial' caused by the need of 'the government to conduct an appropriate investigation' where it did not have 'advance notice of the details of the claimed alibi.'" *Martoma*, 2014 WL 31700, at *5 (quoting Fed. R. Crim. P. 12.1 advisory committee's note).

The defense does not dispute that the Government served a proper Rule 12.1 request and that it has not responded to that request, nor has it responded to the Government's argument that alibi evidence should be excluded. It states simply that it is aware of its obligations under Rule 12.1(a)(2), but it does not state that it has complied with those obligations. Dkt. No. 125 at 6. Accordingly, the Government's motion is granted, and Ortiz is precluded from offering alibi evidence.

## VII. The Government's Motion for a Rule 16(b) Deadline

The Government moves to require Ortiz to produce Rule 16(b) material on or before November 20, 2026, the date for disclosure of law enforcement 3500 material. Dkt. No. 113 at 32–36. Ortiz responds that he is aware of his obligations under Rule 16. Dkt. No. 125 at 16.[11] Accordingly, the Government's motion is granted. Ortiz shall produce his Rule 16(b) material by the end of the day on November 30, 2026.

[11] The defense states that it is aware of its obligations under "Federal Rule of Evidence 16." Dkt. No. 125 at 6. The Court assumes that the reference to the rules of evidence is in error and that the defense intended to refer to Federal Rule of Criminal Procedure 16.

**VIII. The Defense Motion to Limit the Testimony of the Government's Ballistics Expert**

The defense moves to limit the testimony of the Government's expert witness, Alyssia Daniel. Dkt. No. 110 at 7–9. Ms. Daniel is a ballistics expert. Her testimony is based on her toolmark identification analysis. She will testify that shell casings found at the scene of the crime and bullet fragments and deformed bullets found in German's body were all fired from the same gun. The defense does not object to the receipt of the evidence on Rule 702 or *Daubert* grounds, but argues that Ms. Daniel should be precluded from characterizing ballistics as a science and claiming scientific or statistical certainty and should be limited to testifying that her findings are to a reasonable degree of ballistics certainty. *Id.* at 9. The Government responds that it does not intend to elicit from Ms. Daniel on direct examination the degree to which she is certain of her conclusions but that, if pressed by defense counsel during cross-examination, she would testify that she is certain of the ballistics matches in this case.

Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to provide expert testimony, so long as: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Jones*, 965 F.3d 149, 161 (2d Cir. 2020) (quoting *Williams*, 506 F.3d at 160). Courts are to adhere to a "liberal standard of admissibility for expert opinions," *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005), beginning with "a presumption that expert evidence is admissible," *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 115 (S.D.N.Y. 2015)

(citing *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995)). However, a court still must determine that the evidence is "sufficiently reliable so as to be admissible." *Amorgianos v. Amtrak*, 303 F.3d 256, 268 (2d Cir. 2002).

The Second Circuit considered the admissibility of toolmark identification analysis in *United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). The court upheld the admission of such evidence. In that case, the expert testified that, based on her analysis, certain bullets and cartridge casings recovered from the crime scene and the victims' bodies matched those she produced by test firing a firearm recovered from a search of the defendant's premises. *Id.* at 159. The court held that the toolmark identification testimony was properly admitted under Rule 702 and *Daubert*. The expert examined the "class characteristics" of the spent bullets with the firearm she was examining to see whether they were consistent with one another and "to narrow the universe of firearm possibilities to certain types of guns made by certain manufacturers." *Id.* at 159. She then examined the individual characteristics with a comparison microscope to determine whether there was a match. *Id.*

Here, the Court has no basis to exclude or limit Ms. Daniel's testimony. Ms. Daniel is a Level III Criminalist at the Firearms Analysis Section of the New York City Police Department Laboratory. Dkt. No. 126 at 10. She has received specialized training in analyzing ballistics evidence, including in the areas of firearms and ammunition identification, operability of firearms and ammunition, and ballistics analysis and microscopy. She has testified as an expert at trial or by deposition in twenty cases over the last four years. *Id.* at 11. She is prepared to testify that based on microscopic comparisons: (1) five spent shell casings recovered from the crime scene for the September 1, 2020 robbery and homicide were fired by the same gun "based on sufficient agreement of class and individual characteristics of the Firing Pin Impression" and

"sufficient agreement of class and individual characteristics of the Breechface Impression"; (2) one deformed bullet and two bullet fragments recovered from the crime scene for the September 1, 2020 robbery and homicide were fired by the same gun "based on sufficient agreement of class and individual characteristics in Land Impression" and "sufficient agreement of their individual characteristics in Groove Impression"; (3) three deformed bullets recovered from German's body were fired from the same gun "based on sufficient agreement of class and individual characteristics in Land Impression"; and (4) one deformed bullet and two bullet fragments recovered from the crime scene for the September 1, 2020 robbery and homicide and three deformed bullets recovered from German's body were fired by the same gun "based on sufficient agreement of class and individual characteristics in Land Impressions" and "sufficient agreement of class and individual characteristics in Groove Impression." Dkt. No. 110 at 7–8.

"'Every federal court to have examined the issue in a written opinion . . . [has concluded] that ballistic toolmark analysis is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form.'" *United States v. King*, 634 F. Supp. 3d 76, 82 (S.D.N.Y. 2022) (quoting *United States v. Willock*, 696 F. Supp. 2d 536, 568 (D. Md. 2010)). The Court is convinced by the thorough analysis of Judge Paul G. Gardephe. Toolmark identification testimony satisfies Rule 702 and *Daubert*. "[T]he weaknesses in the methodology of toolmark identification analysis are readily apparent, have been discussed at length in the scientific literature, and can be addressed effectively on cross-examination. These weaknesses are also not particularly complicated or difficult to grasp, and thus are likely to be understood by jurors if addressed on cross-examination." *United States v. Johnson*, 2019 WL 1130258, at *19 (S.D.N.Y. Mar. 11, 2019), *aff'd*, 861 F. App'x 483 (2d Cir. 2021); *accord United States v. Boone*, 2024 WL 2160230, at *9 (S.D.N.Y. May 13, 2024). Testimony that might not qualify as

being based on "scientific knowledge" under *Daubert* may still be admissible as being based on "technical or other specialized knowledge" under Rule 702. *See Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017). The limitations that the Government has put on the testimony are acceptable. The Government does not intend to elicit from Ms. Daniel on direct examination "any particular degree of certainty as to h[er] opinions regarding the ballistics match." *Johnson*, 2019 WL 1130258, at *22; *accord United States v. Shipp*, 422 F. Supp. 3d 762, 783 (E.D.N.Y. 2019) (holding that toolmark identification expert may not offer testimony "to any degree of certainty"). "However, if pressed to define [her] degree of certainty during cross-examination, [she] may state [her] personal belief on that issue." *United States v. White*, 2018 WL 4565140, at *3 (S.D.N.Y. Sept. 24, 2018).

Assuming that the Government lays a proper foundation at trial and Ms. Daniel testifies consistent with her expert report, there would be a basis for admitting her testimony. There is no basis for excluding it or limiting it *in limine* and prior to trial.[12]

[12] The defense relies upon Judge Rakoff's opinion in *United States v. Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008) to argue that the expert should be permitted to testify only that the firearms match was "more likely than not," and Judge Castel's questions from the bench in *United States v. McBride*, No. 20 Cr. 363 (S.D.N.Y.), Dkt. No. 66 at 187, to argue that the expert should state that the evidence analyzed was merely "consistent . . . with having been fired through the same firearm." Dkt. No. 127 at 2. Judge Castel did not issue a ruling with respect to the witness's testimony or use the word "merely." His question to the witness did not exclude the possibility that the firearms match was not only consistent with having been fired through the same firearm but that the witness believed, based on his analysis, that there was a match. And Judge Rakoff's opinion was based on the notion that under *Daubert* and *Kumho Tire*, the court has a role "not only in excluding unreliable testimony, but also in alerting the jury to the limitations of what is presented." *Glynn*, 578 F. Supp. 2d at 574. Accepting that premise, the conclusion is that the Court should give an instruction, if requested, that assures that the jury is reminded that it is its task, and not the expert's, to determine the facts in this case, and that it will have to determine the weight, if any, to give to the witness's testimony. It is not to put words in the mouth of the expert that she would not utter herself.

## IX. The Defense Motion to Preclude Evidence of Death Threats by Defendant

Ortiz also moves to preclude the Government from offering testimony on the direct examination of CW-1 that Ortiz threatened to kill his brother and his brother's girlfriend. Dkt. No. 121 at 1. According to CW-1, while he and Ortiz were together at a Bronx state court appearance for the case, Ortiz told him that his brother's girlfriend had spoken to the police and that he intended to have his brother and brother's girlfriend "knocked off" because they were "telling on" him. *Id.*

Ortiz argues that the threat should be excluded because it bears no relation to the charged offenses and does not contain an admission to the murder or Hobbs Act robberies, because it was "not even a genuine threat" but rather "hyperbolic venting," and because the risk of unfair prejudice far outweighs any probative value. *Id.* at 2–3. The Government responds that the threat is evidence of consciousness of guilt. Dkt. No. 132 at 2. It also argues that the threat tends to show Ortiz's participation in the charged crimes. According to the Government, Ortiz's brother and his brother's girlfriend were outside Ortiz's residence on the night of the murder, including when the perpetrators returned and when police arrived, and Ortiz's decision to target them shows he knew they could place him at the scene. *Id.* The Government also argues that Ortiz would have no reason to discuss something he was so intent on concealing unless he knew that CW-1 had participated in the robbery, so his choice to confide in CW-1 both inculpates Ortiz and corroborates CW-1's account. *Id.* at 2–3. Finally, the Government contends that the threat will help the jury evaluate CW-1's credibility and demeanor on the stand. *Id.* at 3.

"Evidence of threats of death is subjected to the same Rule 403 balancing test as other relevant evidence, though the stakes may be heightened, for evidence of death threats may be extremely probative when the threats were directed against a witness, and the potential for inflaming the jury may be great." *United States v. Tracy*, 12 F.3d 1186, 1195 (2d Cir. 1993)

(internal citations omitted). "Rule 403's balancing test permits admission of death threat evidence only if there is clear need for the evidence and it serves an important purpose." *United States v. Morgan*, 786 F.3d 227, 229 (2d Cir. 2015); *see United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982) ("[T]he government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test."). "Evidence of threats by a defendant against a potential witness against him can . . . be used to show guilty knowledge," and "[t]hat is certainly true when threats are 'inextricably intertwined with the evidence regarding the charged offense.'" *Morgan*, 786 F.3d at 232 (first quoting *United States v. Bein*, 728 F.2d 107, 114–15 (2d Cir. 1984); and then quoting *United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007)). *Compare Quinones*, 511 F.3d at 309–10 (threats admissible where they "contained [the defendant's] admissions to the [charged] murder"), *and Tracy*, 12 F.3d at 1195 (threats admissible to show the defendant "was a member of the conspiracy"), *with Morgan*, 786 F.3d at 232 (threats inadmissible where they "bore no relation to the offenses for which Morgan was being tried").

The threat allegedly made by Ortiz in the presence of CW-1 serves an important purpose. It inculpates Ortiz in the September robbery and killing of German and suggests consciousness of guilt. The Government proffers that it will offer evidence that Ortiz's brother and his brother's girlfriend were outside of Ortiz's residence on the night of German's murder, including when the perpetrators returned and when police arrived. Dkt. No. 132 at 2. Ortiz's acknowledgment that his brother and his brother's girlfriend would have evidence that they could use to "tell on him" thus places Ortiz directly at the location of the crime, shows his connection to the brother and the brother's girlfriend at the time of the crime, and provides evidence of his participation in the crime. It corroborates other evidence that Ortiz was present at a key moment in the case. *See Tracy*, 12 F.3d at 1195. That Ortiz confided the threat to CW-

1, an alleged participant in the robbery, also tends to corroborate CW-1's account that he and Ortiz participated in the crime. *Cf. id.* (threats relevant "to confirm the testimony of the cooperating codefendants"). And that he believed that the information that they would tell on him was sufficiently great that he was willing to have them killed tends to suggest that he participated in the crime through conduct that could land him in prison for a lengthy period of time. It provides consciousness of guilt. The fact that the statement was made in front of CW-1 who will be testifying against Ortiz at trial is also relevant to assessing CW-1's demeanor. *See Qamar*, 671 F.2d at 736 (threat helped explain why witness "testified in an almost inaudible voice" (internal quotation marks omitted)); *Quinones*, 511 F.3d at 310 (death threat may be admitted "to explain the demeanor" of a testifying witness). CW-1 will testify a few feet from Ortiz, who told him that he intended to have two people "knocked off" for "telling on" him. Assuming the defense attacks CW-1's credibility, evidence of the threat could help the jury decide whether any anxiety CW-1 shows on the stand reflects untruthfulness or concern for his safety. Dkt. No. 132 at 3. It is of no moment that CW-1 was not himself the target of the threat, because the threat's relevance to the charged crimes means its admissibility does not depend on its having been "directed against the witness who testifies to it." *Quinones*, 511 F.3d at 310.

Whether the threat was genuine or merely "hyperbolic venting," Dkt. No. 121 at 2–3, goes to its weight, and Ortiz is free to make that argument to the jury. The probative value of the statement, moreover, does not depend solely on whether Ortiz intended to carry out the threat. That Ortiz would be willing to contemplate the death of his brother and brother's girlfriend to keep them from stating what they knew about Ortiz's involvement in the robbery certainly provides evidence that Ortiz believed that what they knew would be severely inculpatory, but the relevance of the evidence lies in his identification of two witnesses to the night of the murder as

people who were "telling on" him. Nor is the threat inadmissible because it contains no express admission to the charged crimes; the threats in *Tracy* contained none either.

The Second Circuit has cautioned that the decision to admit death threat evidence is not to be taken lightly. The Court must carefully consider whether the probative value of the evidence is substantially outweighed by the danger of its prejudicial impact. But here, the probative value is great and the risk of unfair prejudice is limited. The existence of the threat is important evidence of Ortiz's involvement in the September robbery and the murder of German. But the risk of prejudice against which Rule 403 guards is that the evidence will have "'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). It is not that the evidence is powerful proof of the charges against the defendant. The risk of *unfair* prejudice here is measured. To be sure, that Ortiz was willing to contemplate the murder of his brother and his brother's girlfriend may have some appeal to the passion of the jurors, but Ortiz is charged with a crime—the killing of a stranger during a marijuana transaction—that, if not policed by careful instructions, could incite the passion of a juror. The evidence of the threat is thus "no more inflammatory than the charged murder itself." *Quinones*, 511 F.3d at 310. Any residual risk can be addressed, if requested, through a limiting instruction cautioning the jury not to consider the threat as evidence of Ortiz's violent character. *See Tracy*, 12 F.3d at 1195.

## X. The Defense Motion to Preclude Testimony of His Purported Confession

Finally, Ortiz moves to preclude testimony from another cooperating witness, CW-3, that Ortiz confessed murder to him. Dkt. No. 121 at 4. Ortiz understands from the Government's production that CW-3 will testify that, about a month after German's murder, Ortiz displayed a gun and made an inculpatory statement about the killing. Ortiz argues, however, that CW-3's

account of that statement has shifted over time. In June 2022, CW-3 told the NYPD that Ortiz asked "where [CW-3] heard that" and "who else he has to body." In June 2023, CW-3 told a state grand jury that Ortiz said, "I killed a guy, there's people talking about what I did then I'm going to have to kill them too." In July 2025, CW-3 told federal prosecutors that Ortiz said, "I did that shit, what are you going to do about it?"

Ortiz argues that these statements are so vague and nonspecific that their probative value is minimal, and that no limiting instruction could cure the risk of unfair prejudice given the inflammatory nature of the testimony. *Id.* at 4–5. The Government responds that although CW-3's wording has varied, the substance of his account has not. In each version, Ortiz admitted to a murder after German's death while displaying a gun, and any inconsistencies are a matter for cross-examination, not exclusion. Dkt. No. 132 at 3. The Government further argues that the statement is relevant because its timing supports the inference that Ortiz was referring to German's murder, and that Ortiz's view of its weight is an argument for trial. *Id.* at 4. Finally, the Government contends that the testimony is no more prejudicial than the other evidence of Ortiz's guilt for the robbery and murder. *Id.*

A statement "offered against an opposing party" that "was made by the party in an individual or representative capacity" is not hearsay. Fed. R. Evid. 801(d)(2)(A). Such a statement remains subject to Rule 403, which permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. As noted, evidence is unfairly prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

Ortiz does not dispute that his statements to CW-3 are admissible as statements of a party opponent. *See* Fed. R. Evid. 801(d)(2)(A). That CW-3's description of those statements has varied does not warrant exclusion. In each account, CW-3 describes Ortiz, about a month after German's murder and while displaying a gun, making a statement that the jury could reasonably understand as an admission to a killing. The differences in wording among those accounts may go to CW-3's credibility, which Ortiz may test on cross-examination and which is for the jury to assess. Ortiz's argument that the statements are too vague to be probative likewise goes to their weight, not their admissibility. The timing of the statements supports a reasonable inference that Ortiz was referring to German's murder, and Ortiz may argue otherwise to the jury. Nor does Rule 403 require exclusion. A defendant's admission to the charged crime is highly probative, and its tendency to prove his guilt is not unfair prejudice. *See Figueroa*, 618 F.2d at 943. The statements are also no more inflammatory than the evidence of the charged robbery and murder itself. *See Quinones*, 511 F.3d at 310.

## XI. The Defense Motion to Dismiss Counts Three, Four, and Seven of the Indictment[13]

Count Three of the Indictment charges Ortiz with a violation of 18 U.S.C. § 924(j) in connection with the Hobbs Act robbery on September 1, 2020, Count Four charges Ortiz with a violation of 18 U.S.C § 924(c)(1)(A) in connection with the Hobbs Act robbery on September 1, 2020, and Count Seven charges Ortiz with a violation of 18 U.S.C. § 924(c)(1)(A) in connection with the Hobbs Act robbery on November 3, 2020. Dkt. No. 6 ¶¶ 6–7, 10. Ortiz argues that a Hobbs Act robbery is not a crime of violence under the "elements" clause of 18 U.S.C. § 924(c)(1)(A) and therefore cannot serve as a predicate for Counts Three and Seven. Dkt. No. 109 at 2.

[13] The defense motion at different points (and inconsistently) references Counts Three, Four, and Seven. Dkt. No. 109. The Court construes it to be directed at each of those counts.

The Second Circuit has held that "completed Hobbs Act robberies are categorically crimes of violence pursuant to section 924(c)(3)(A)." *United States v. McCoy*, 58 F.4th 72, 74 (2d Cir. 2023). As Ortiz acknowledges, Second Circuit precedent forecloses his argument. Dkt. No. 109 at 2. The motion to dismiss therefore is denied.

**CONCLUSION**

The Court reserves decision on the portions of the Government's motion to permit testimony regarding prior criminal acts and Ortiz's corresponding motion to preclude the Government's Rule 404(b) evidence concerning the July 2020 conduct. In all other respects, the Government's motions are GRANTED and Defendant's motions are DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 109 and 121.

SO ORDERED.

Dated: November 25, 2026
New York, New York

LEWIS J. LIMAN
United States District Judge